CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

OCT 2 6 2012

JULIA C. DUDLEY, CLERK
BY: /s/
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| FREDERICK COUNTY SANITATION AUTHORITY, | ) ) ) |
| Plaintiff, | ) Civil Action No. 5:11cv006 ) |
| v. | ) ) By: Michael F. Urbanski |
| O-N MINERALS (CHEMSTONE) CO., | )     United States District Judge ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION

This matter is before the court on defendant O-N Minerals (Chemstone) Company, d/b/a Carmeuse Lime & Stone's ("Carmeuse") motion for partial summary judgment (Dkt. # 60) and second motion for summary judgment (Dkt. # 79) in a declaratory judgment action brought by the Frederick County Sanitation Authority ("the Authority"). The parties have fully briefed the issues and oral argument was held on June 28, 2012 and August 7, 2012. At the court's request, the parties have filed complete copies of the depositions taken in this case for the court's review. Upon consideration of this voluminous material, it is clear that genuine issues of material fact abound in this case. Consequently, Carmeuse's motions must be denied and the case set for jury trial.

### I.

This dispute involves interpretation of the terms of a Lease Agreement ("the Agreement") entered into between the Authority and Carmeuse's predecessor, Global Stone Chemstone

Corporation ("Global"), on March 2, 2000.[1] In the Agreement, Carmeuse leases to the Authority three parcels of land in Frederick and Shenandoah counties on which Carmeuse operates limestone quarries. The properties principally at issue in this case are the Middletown and Clearbrook parcels. The Agreement grants the Authority the unlimited right to extract water from Carmeuse's water-filled quarry pits, except for that required by Carmeuse for its operations. Ex. A to Carmeuse's Partial Summ. J. Br., Dkt. # 60-2, at ¶ 1. The Agreement grants the Authority the right to erect, install and maintain facilities necessary to extract, purify and distribute water at each site. Id. The Agreement assures that Carmeuse's rights to mine and process limestone ore are superior to the Authority's rights to use and occupy the leased premises for withdrawal of water. Id. at ¶ 4. In areas of active quarrying, the Agreement provides that Carmeuse will operate and maintain its own pumping equipment. Id. at ¶ 11.

In the Agreement, the parties acknowledge that certain rezoning of Carmeuse's properties is contemplated. Id. at ¶ 8. The crux of this dispute concerns the scope of the Authority's obligation to reimburse Carmeuse for "costs associated with the rezoning process" concerning the Middletown and Clearbrook parcels. The disagreement centers around the meaning of paragraph 8 of the Agreement, which states in full:

> 8. COSTS OF REZONING TO BE BORNE BY AUTHORITY: The parties recite and understand that certain rezoning of Global's properties is contemplated. The Authority supports Global's efforts in that respect and agrees to pay for the cost associated with the rezoning process, including consultant and filing fees as well as attorney's fees and court costs.

Id. at ¶ 8.

The Authority reads this paragraph to mean that it is only required "to pay for the cost[s] associated with the final rezoning process," which it interprets to be costs incurred prior to

---

[1] Although the Agreement was entered into between the Authority and Global, for ease of reference, Global is referred to herein as Carmeuse.

zoning approval by Frederick County. The Authority, focusing its argument on the term rezoning "process," argues that reimbursable costs do not include proffer expenses incurred by Carmeuse after final zoning approval is obtained.

Carmeuse, on the other hand, disagrees that the obligation to reimburse its costs was so limited in the Agreement and asserts that the Authority is obligated to pay for all of its rezoning costs, including costs incurred in complying with proffers made during the rezoning. While the Authority reimbursed Carmeuse for the costs of rezoning for a period of time without any controversy, Carmeuse alleges the Authority ceased making the required payments. Carmeuse attributes this change in the parties' course of dealing to a change in the Authority's management. In addition to the failure to reimburse proffer expenses, Carmeuse contends that the Authority has failed to support its rezoning efforts, in contravention of the Agreement, thereby increasing its costs. Carmeuse further contends that while the Authority extracts water from inactive pits, it takes no water from pits where Carmeuse is actively mining, resulting in significant additional cost and expense.

The Authority filed suit in the Circuit Court of Frederick County on January 28, 2011 after Carmeuse began asserting the Authority was in breach of the Agreement and threatened to terminate the Agreement, which would leave the Authority without a water supply. In its complaint, the Authority seeks declaratory and injunctive relief. Carmeuse removed this matter to federal court on February 7, 2011 and subsequently has filed an amended answer and counterclaim.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236-37 (4th Cir. 1995). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Nguyen, 44 F.3d at 237. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "All reasonable inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion," but "[a] mere scintilla of evidence supporting a case is insufficient." Nguyen, 44 F.3d at 237.

Carmeuse claims it is entitled to summary judgment on its claim that the Authority has breached the Agreement, arguing that there are no genuine issues of material fact in dispute on the following three points:

1. The Authority has breached the Agreement by not paying its costs associated with the rezoning of the Middletown and Clearbrook parcels;

2. The Authority has not supported Carmeuse's efforts to rezone the Clearbrook property; and

3. The Authority has not de-watered quarry pits where Carmeuse is actively mining.

4

As detailed below, however, because genuine issues of material fact exist concerning each of these issues, Carmeuse's motions for summary judgment must be denied.

## III.

Carmeuse asserts two material breaches of the Agreement concerning reimbursement of rezoning costs. First, Carmeuse argues generally that paragraph 8 of the Agreement is not limited in time or scope and that the Authority is obligated to reimburse it for all rezoning costs, including costs to comply with proffers it made during the rezoning. Second, Carmeuse argues that even under the Authority's interpretation of its reimbursement obligation, the Authority has materially breached the Agreement by withholding payments it acknowledges are due and owing.

### A. Scope of the Authority's Cost Reimbursement Obligation.

As to the larger issue, the principal area of disagreement concerns the obligation of the Authority to pay for the construction of large earthen berms around the Carmeuse's quarrying operations. In order to obtain the rezoning, Carmeuse proffered the construction of these berms. Consequently, Carmeuse asserts that because the construction of the berms was proffered in and required by the rezoning, paragraph 8 of the Agreement obligates the Authority to reimburse it for the cost of the construction of those berms. Carmeuse argues that the caption of paragraph 8, "COSTS OF REZONING TO BE BORNE BY AUTHORITY," is broadly worded, contains no end date and makes no reference to the "rezoning process." As to the body of paragraph 8, Carmeuse focuses on the word "associated," contending that it connotes an unlimited obligation to reimburse rezoning costs.

The Authority seizes on paragraph 8's use of the term "rezoning process," maintaining that its obligation to reimburse costs ends once the process is completed. Accordingly, the

Authority argues, once final rezoning approval is rendered by Frederick County, its obligation to reimburse costs ceases. In support of its position, the Authority argues that the type of costs listed in paragraph 8, namely, "consultant and filing fees as well as attorney's fees and court costs," are the sort of costs typically incurred during the rezoning process. As to Carmeuse's contention that paragraph 8 obligates the Authority to pay the cost of implementing its rezoning proffers, the Authority points out that the word "proffer" does not appear in paragraph 8. The Authority argues that the absence of a reference to paying for proffer expenses in paragraph 8 is consistent with the obligations assumed by the parties under the preceding paragraph. In paragraph 7, the Authority expressly agreed to pay the cost of relocating certain ballfields displaced by mining operations on the rezoned Clearbrook property. The Authority asserts that relocation of the ballfields was proffered in the rezoning and was the only proffer it agreed to fund. Under established principles of contract construction, the Authority contends that paragraph 7 would be rendered superfluous if Carmeuse's interpretation of paragraph 8 was adopted.

In the briefs on partial summary judgment, both parties asserted that the Agreement was ambiguous as to the extent of the Authority's obligation to pay the costs to implement the Carmeuse proffers.[2] Nothing in the many briefs and exhibits filed subsequently suggests a contrary conclusion.

The issue of whether a contract provision is ambiguous presents a question of law, not of fact. Utsch v. Utsch, 266 Va. 124, 129, 581 S.E.2d 507, 509 (2003); Pyramid Dev., L.L.C. v. D & J Assocs., 262 Va. 750, 754, 553 S.E.2d 725, 727 (2001); Pollard & Bagby, Inc. v. Pierce Arrow, L.L.C., III, 258 Va. 524, 528, 521 S.E.2d 761, 763 (1999). The language of a contract is

---

[2] For example, Carmeuse represented: "The parties have agreed that the Agreement and the Lease contain latent ambiguities as to the meaning of the term 'the cost associated with the rezoning process,' and thus the meaning of that term will be for the trier of fact to determine." Carmeuse's Partial Summ. J. Br., Dkt. # 60-1, at 2-3.

6
Case 5:11-cv-00006-MFU-BWC   Document 87   Filed 10/26/12   Page 6 of 18   Pageid#: 2126

ambiguous if "it may be understood in more than one way or when it refers to two or more things at the same time." Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 632, 561 S.E.2d 663, 668 (2002) (quoting Granite State Ins. Co. v. Bottoms, 243 Va. 228, 234, 415 S.E.2d 131, 134 (1992)); accord Westmoreland-LG & E Partners v. Va. Elec. & Power Co., 254 Va. 1, 11, 486 S.E.2d 289, 294 (1997). Such an ambiguity, if it exists, must appear on the face of the instrument. Salzi v. Va. Farm Bureau Mut. Ins. Co., 263 Va. 52, 55, 556 S.E.2d 758, 760 (2002); S.F. (Jane Doe) v. West Am. Ins. Co., 250 Va. 461, 464, 463 S.E.2d 450, 452 (1995). In determining whether the disputed terms are ambiguous, the court must consider the words employed in the contract in accordance with their usual, ordinary, and popular meaning. See Haisfield v. Lape, 264 Va. 632, 637, 570 S.E.2d 794, 796 (2002); Pocahontas Mining Ltd. Liab. Co. v. Jewell Ridge Coal Corp., 263 Va. 169, 173, 556 S.E. 2d 769, 772 (2002).

Because the contested cost reimbursement language contained in paragraph 8 can be understood in more than one way, it is ambiguous. The agreement does not contain any clear cut delineation of just what was meant to be included in the reimbursable costs of rezoning. On the one hand, the broad scope of the caption of paragraph 8 and the absence of any limitation on the phrase "cost associated" in its text is consistent with Carmeuse's argument that the Authority is obligated to pay for the construction of the berms required by the rezoning. So too is the notion that a proffer is a creature of statute and occurs only in connection with a rezoning. On the other hand, the "rezoning process" language in paragraph 8 suggests a limitation, and the kinds of costs referenced therein bear no resemblance to the long term, high dollar cost of constructing berms around Carmeuse's expanding mining operations. The Authority aptly points out that the Agreement nowhere mentions reimbursement of proffer costs, and the only expenses in the agreement which are remotely similar, involving relocation of ballfields on the Clearbrook site,

7

are expressly contracted for in paragraph 7. On its face, therefore, the court agrees that the Agreement is ambiguous as to the contested obligation of the Authority to pay the cost of berm construction and other proffer expenses incurred by Carmeuse following approval of the rezoning.

When the terms of an agreement are ambiguous, a court will consider parol evidence to ascertain the intent of the parties. Eure, 263 Va. at 632, 561 S.E.2d at 667-68; Tuomala v. Regent Univ., 252 Va. 368, 374, 477 S.E.2d 501, 505 (1996). Parol evidence "is admissible, not to contradict or vary contract terms, but to establish the real contract between the parties." Tuomala, 252 Va. at 374, 477 S.E.2d at 505.; accord Prospect Dev. Co. v. Bershader, 258 Va. 75, 84, 515 S.E.2d 291, 296 (1999). Such construction of an ambiguous contract is a matter submitted to the fact finder, who must consider the extrinsic evidence in determining the parties' intent. Tuomala, 252 Va. at 374, 477 S.E.2d at 505; Cascades N. Venture Ltd. P'ship v. PRC Inc., 249 Va. 574, 579, 457 S.E.2d 370, 373 (1995).

In searching for that interpretation of ambiguous contractual provisions that reasonably reflects the parties' intention, the court may resort to extrinsic evidence, especially evidence indicating the practical construction the parties give the provisions. "When the terms of an agreement are doubtful or uncertain, the interpretation placed thereon by the parties themselves is entitled to great weight and will be followed if that may be done without violating applicable legal principles." Dart Drug v. Nicholakos, 221 Va. 989, 995, 277 S.E.2d 155, 158 (1981), (quoting L. O'Quinn v. P. Looney, 194 Va. 548, 552, 74 S.E.2d 157, 159 (1953)).

Despite the ambiguity of paragraph 8 of the Agreement, Carmeuse asserts in its second summary judgment motion that there is no genuine issue of material fact in dispute that the Authority is obligated to pay the costs of constructing the berms required by the proffers.

8

Carmeuse argues that proffers are creatures of Virginia law and, as such, are part and parcel of the rezoning process. See Va. Code Ann. § 15.2-2296 ("[T]hrough conditional zoning, . . . a zoning reclassification may be allowed subject to certain conditions proffered by the zoning applicant for the protection of the community that are not generally applicable to land similarly zoned."); see also Hale v. Bd. of Zoning Appeals for Town of Blacksburg, 277 Va. 250, 273, 673 S.E.2d 170, 182 (2009) ("Proffers are voluntary commitments made by landowners in order to facilitate approval of conditional zoning and rezoning requests by ameliorating the impact of development of their property on the local infrastructure and the character and environment of adjoining land. In Virginia, proffers, once accepted, have the force equal to the requirements of the zoning ordinance." (internal citations omitted)). Carmeuse also notes that the Authority's current rationale for not paying its invoices runs counter to the position it took previously when it questioned whether or not the costs were for mining and/or extraction or were otherwise non-zoning related. Finally, Carmeuse argues that the Authority historically has reimbursed it for costs incurred after final zoning approval, and that the course of dealing between the parties supports its reading of the Agreement.

The Authority disagrees, noting that the Agreement makes no mention of proffers and that the only proffer discussed between the architects of the Agreement, Joseph Ferrell, on behalf of Carmeuse's predecessor Global, and Wellington Jones, on behalf of the Authority, concerned the relocation of the Clearbrook ballfields expressly covered in paragraph 7. Wellington Jones testified that the Authority never undertook to pay for safeguards to minimize the mining impact on the community and its obligation was limited to items strictly involved in the rezoning application and process of rezoning, until rezoning was approved. The Authority also argues that budgets and billings provided by Carmeuse and its engineers did not contain expenses associated

9

with berm construction and are inconsistent with the position taken by Carmeuse now. In that regard, the Authority argues that it would have made no sense for the Authority to agree to cover expenses to construct berms for Carmeuse as such construction may not occur for many years in the future.

Plainly, genuine issues of material fact abound as to the obligation of the Authority to reimburse Carmeuse its costs expended to comply with its rezoning proffers. On its face, the Agreement is ambiguous, and the parol evidence is in conflict as to which interpretation of the Agreement reasonably reflects the parties' intent. This issue, therefore, requires resolution by a jury.

### B. The Impact of the Authority's Failure to Tender Acknowledged Amounts Due and Owing Carmeuse.

Carmeuse next argues that, even under the Authority's interpretation of the Agreement, the Authority has failed to pay amounts which it concedes are due and owing and that the failure to timely tender these sums is a material breach of the Agreement. Under the first breach doctrine, see, e.g., Tandberg, Inc. v. Advanced Media Design, Inc., No. 1:09cv863, 2009 WL 4067717 (E.D. Va. Nov. 23, 2009); Countryside Orthopaedics, P.C. v. Peyton, 261 Va. 142, 541 S.E. 2d 279 (2001); Horton v. Horton, 254 Va. 111, 487 S.E. 2d 200 (1997), Carmeuse argues the Authority's failure to pay precludes it from enforcing the Agreement.

Although it has long understood that it owes Carmeuse some money, the Authority argues that there has been no material breach, because the Agreement is silent as to timing of any reimbursements, and only the failure to make timely payments constitutes a material breach. Carmeuse responds that the parties' prior course of dealing reflecting a history of prompt payment, belies this notion. In any event, Carmeuse asserts "it cannot seriously be contended

10
Case 5:11-cv-00006-MFU-BWC   Document 87   Filed 10/26/12   Page 10 of 18   Pageid#: 2130

under any circumstances that two years is a reasonable time for payment." Carmeuse's Second Summ. J. Mot. Reply Br., Dkt. # 83, at 6.

The Authority also argues that the invoices submitted by Carmeuse did not contain sufficient supporting documentation. While it paid some of those invoices, it did not pay invoices dated November 3, 2010, April 14, 2011, and June 3, 2011 for lack of supporting documentation, which documentation the Authority did not receive until discovery commenced in this case. Carmeuse asserts there was no requirement that it provide such documentation and that it was the Authority which, after receiving the first invoice of June 13, 2008 containing supporting documentation, actually requested such documentation not be sent in the future unless requested. Carmeuse says no request for documentation was made until after the lawsuit was filed.

Carmeuse claims that the Authority owes it $1,733,247.91, much of which is for berm construction. At the hearing held on June 28, 2012, the Authority estimated that approximately $500,000 of non-berm expenses had not been reimbursed, although not all of these amounts were due Carmeuse, as some post-dated final rezoning approval. In subsequent briefing, the Authority conceded after examination of supporting documentation provided by Carmeuse that it owes Carmeuse $111,542.02.[3] The fact that the Authority owes some money to Carmeuse for certain

---

[3] In its brief, the Authority states that it "tenders the payment of such amount to Carmeuse." Authority's Opp. Br. to Second Mot. for Summ. J., Dkt. # 82, at 26. Carmeuse states that it has not received this amount from the Authority. Carmeuse's Second Summ. J. Mot. Reply Br., Dkt # 83, at 6 n.4.

categories of costs has been readily acknowledged by the Authority,[4] but it disputes the magnitude of the monies claimed by Carmeuse. Certainly, there is a world of difference between Carmeuse's position that the Authority owes it $1.7 million, and the Authority's recent acknowledgement that it owes Carmeuse $111,542.02. Just what is owed under the Agreement will turn, in large measure, on the jury's view of the proper scope of the reimbursement obligation under paragraph 8. As such, it is not appropriate to enter summary judgment at this time as the amount due cannot be ascertained at this point and awaits the verdict of the jury.

Nonetheless, Carmeuse argues that the fact that the Authority acknowledges owing Carmeuse a sum of money obligates the court to apply the so-called first breach rule and declare that the Authority can no longer enforce the Agreement. Ostensibly, this means that Carmeuse could choose to stop the flow of water from its properties to the Authority and the Authority would be without recourse.

Simply stated, the first breach rule provides that "a contractual party who first commits a *material* breach may not sue to enforce subsequent breaches by the other party." Tandberg, 2009 WL 4067717, at *2 (emphasis in original). "There is, however, an exception to that general rule 'when the breach did not go to the "root of the contract" but only to a minor part of the consideration.'" Countryside Orthopaedics, 261 Va. at 154, 541 S.E.2d at 285 (quoting Horton, 254 Va. at 115, 487 S.E. at 203 (quoting Federal Ins. Co. v. Starr Elec. Co., 242 Va. 459, 468, 410 S.E. 2d 684, 689 (1991); Neely v. White, 177 Va. 358, 366, 14 S.E. 2d 337, 340 (1941))). Further, as noted in Tandberg, "the injured party suffering from a material breach of contract

---

[4] For example, Uwe Weindel, the Authority's Rule 30(b)(6) deposition designee, testified as follows:

> Q. And you'll also agree, and the Sanitation Authority will agree that there are categories of costs that are – even under the Sanitation Authority's interpretation of the agreement are clearly reimbursable, but they've just not been paid.
> A. Correct.

Ex. E to Carmeuse's Partial Summ. J. Br., Dkt. # 60-2, at 400.

12

need not immediately terminate the contract, but may, out of prudence and fairness, afford the breaching party an opportunity to cure the breach." 2009 WL 4067717, at *4. On the application of the first breach rule to this case, factual questions abound.

First, what was the first breach? Was it the Authority's failure to pay the amounts due in the bills submitted by Carmeuse? Or was it Carmeuse's submission of bills for many hundreds of thousands of dollars of berm construction expenses which, under the Authority's interpretation of the Agreement, were unjustified?

Second, did the Authority materially breach the contract by withholding payment on Carmeuse's billings after November, 2010 until its billing inquiries were answered? In other words, does fairness dictate that the Authority "be allowed a period of time – even if only a short one – to cure the breach if it can." Tandberg, 2009 WL 4067717, at *4. In that regard, were the efforts of the Authority to obtain backup documentation for Carmeuse's bills and the Authority's filing of the declaratory judgment action, reasonable efforts to cure?

Third, given the overall scope of the Agreement, recognizing on one hand the Authority's support for Carmeuse's rezoning efforts necessary to allow its mining operations to expand, and on the other hand allowing the Authority to obtain a plentiful and cheap source of water, can the acknowledged failure to pay $111,542.02 rise to the level of a material breach? "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats the essential purpose of the contract." Horton, 254 Va. at 115, 487 S.E.2d at 204. Given the essential purpose of this contract, is the failure to tender $111,542.02 until billing questions are resolved so essential that the purpose of the Agreement is defeated?

In short, before the court can be called upon to apply the first breach rule, the jury must determine: (1) whether the Agreement has been breached; (2) which party, if any, breached the Agreement; (3) which party, if any, breached first; (4) whether such a breach was material; and (5) finally, whether the Authority be allowed, in the words of the Tandberg court, a prudent and fair opportunity to care? On this factually disputed record, summary judgment cannot be granted.

### IV.

Carmeuse next argues that "it is undisputed that the Authority, in violation of the Agreement, has failed to support Carmeuse's efforts to rezone the Clearbrook Property." Carmeuse's Partial Summ. J. Br., Dkt. # 60-1, at 10. As noted above, paragraph 8 of the Agreement provides that the "parties recite and understand that certain rezoning . . . is contemplated;" that "[t]he Authority supports Global's efforts" with respect to rezoning, and that the Authority agrees to pay costs associated with the rezoning process. However, paragraph 8 is worded such that the Authority's support for Global's rezoning efforts is couched in the present tense. Indeed, there is nothing in the Agreement which specifies the extent to which the Authority is required to support rezoning efforts in the future. On its face, therefore, the Agreement is ambiguous as to the nature and extent of the Authority's obligation to support Carmeuse's rezoning efforts.

Nor does the evidence cited by Carmeuse suggest that this issue is undisputed. Carmeuse claims that during the legislative process for the Middletown rezoning, "the Authority publicly supported the rezoning in its comments as a reviewing agency, and in an email it sent to the members of the Board of Supervisors." Carmeuse's Second Mot. for Summ. J. Br., Dkt. # 80, at ¶ 18. However, it claims that during the subsequent Clearbook rezoning, the "Authority did not

respond to Carmeuse's request for comment, delaying Carmeuse's ability to file its application to rezone the Clearbrook Property." Id. at ¶ 24. This led Carmeuse to request an exception to the Board's procedures requiring comments from the Authority in order to proceed with its rezoning application. Carmeuse asserts it incurred additional expenses by its development team during this time, in the amount of $10,442.11. The Authority disputes any responsibility for the rezoning approval delay. Michael Ruddy, Deputy Director of Planning and Development for Frederick County, testified that Carmeuse's rezoning application was not held up by the Authority's failure to provide comment, but was instead processed at the next available Planning Commission meeting. Authority's Opp. Br. to Second Mot. for Summ. J., Dkt. # 82, at 6.

Carmeuse argues further that the comments submitted by the Authority, some five months later, were less than fully supportive. Indeed, Carmeuse asserts that in a letter dated June 1, 2011, "the Authority stated it would be unable to support the rezoning request unless Carmeuse made major concessions to the Authority – in effect agreed to provide a continuing source of water with little or no consideration. It is clear that based on the Authority's statements to the Frederick County Board of Supervisors, the Board tabled Carmeuse's rezoning request." Carmeuse's Partial Summ. J. Br., Dkt. # 60-1, at 10. Carmeuse contends that the Board tabled the rezoning request for several months due to the apparent dispute between Carmeuse and the Authority.

The Authority counters by arguing that the June 1, 2011 letter on its face does not indicate a lack of support, but rather reflects the Authority's view that the Clearbrook Proffer Statement should contain the same sort of assurances as to the Authority's access to water as set forth in the earlier Middletown Proffer Statement. The impact of the June 1, 2011 letter and the Authority's earlier "no comment" position are less than clear. Moreover, there does not appear

15

to be any admissible evidence directly linking any action or inaction on the part of the Authority with the delay in the Clearbrook rezoning. Wellington Jones testified that while the Authority supported the rezoning, it "wanted to make sure that everyone understood [it wasn't] an active participant in the rezoning, because the rezoning is between Global Chemstone and the county." Authority's Opp. Br. to Mot. for Partial Summ. J., Dkt. # 65-2, at 47. Jones went on to testify that his understanding of the Authority's obligations under the Agreement was that the Authority "couldn't publicly come out and say that this is a good thing, it ought to be done, but we did so privately and behind the scenes." Id. at 60. He continued, "I think it was more that we would not stab the quarry in the back ... We thought this was a good deal, and we were going to support it in that fashion. We would not say otherwise." Id. at 61.

In sum, there remains a genuine issue of material fact as to the intent of the parties as to what kind of support the Authority was required to accord Carmeuse's rezoning efforts pursuant to the Agreement and a genuine issue of material fact as to whether the Authority's conduct as regards the Clearbrook rezoning met that standard.

## V.

Carmeuse's final argument is even more attenuated. It argues that it is entitled to summary judgment because the Authority has admitted that "the clear intent of the Agreement was to have the Authority absorb the costs Carmeuse would otherwise incur in de-watering the pits where it was actively mining, and that the Agreement required the Authority to draw its water from those specific pits." Carmeuse's Partial Summ. J. Br., Dkt. # 60-1, at 10.

Carmeuse bases this argument upon the deposition testimony of James Anderson, the former chairman of the Authority's board and Rule 30(b)(6) designee on certain issues. Anderson testified that "[t]he agreement was we're going to take that discharge that's coming out

16

of the active pit – we, the Sanitation Authority, clean it up or dirty it up, whatever you need to do, and put it into the drinking water supply." Ex. G to Carmeuse's Partial Summ. J. Br., Dkt. # 60-2, at 32. Anderson went on to testify that to his knowledge, that's what was done. Id. While the record contains this admission, other evidence in the record suggests the contrary. For example, Wellington Jones, another former Authority executive and Rule 30(b)(6) designee, testified that: "We weren't going to take water out of the active pit. That was going to be Global Chemstone's responsibility. But we would take it from other pits that were available." Authority's Opp. Br. to Mot. for Partial Summ. J., Dkt. # 65-1, Ex. 2, at 67-68. While conceding that water would be an impediment to mining an active pit, Jones went on to state "if I was in the quarrying operation, I wouldn't want to rely upon some third-party to get the water out of there. What if they failed?" Id. at 68-69.

More to the point, however, there is no provision of the Agreement requiring the Authority to de-water active mining sites. While the Agreement provides the Authority with the "unlimited right to extract water from the quarry pits, except for that amount required by Global for its operations," Ex. A to Carmeuse's Partial Summ. J. Br., Dkt. # 60-1, at ¶ 1, it imposes no affirmative obligation on the Authority to remove water from active mining areas. Indeed, paragraph 11 of the Agreement, stating that Carmeuse "will operate and maintain its own pumping equipment for active quarrying operations," suggests just the contrary. As such, Carmeuse's motion for summary judgment on the issue of de-watering active mining pits cannot be granted.

## VI.

As genuine issues of material fact exist as to the obligation of the Authority under the Agreement to "pay for the cost associated with the rezoning process," support the rezoning of the

land for quarrying activities, and to de-water active mine sites, summary judgment cannot be entered for Carmeuse. By separate Order, its motions will be denied and the case set for trial.

Entered: 10-26-12

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge